168 So.2d 1

**Nancy Jeanette BOGGS, pro ami,**

v.

**Betty TURNER et al.**

**1 Div. 65.**

Supreme Court of Alabama.

Oct. 8, 1964.

Cunningham & Bounds and Barry Hess, Mobile, for appellant.

**158**

Collins, Galloway & Murphy, Mobile, for appellee Turner.

LIVINGSTON, Chief Justice.

Nancy Jeanette Boggs, a minor, by her father and next friend, sued Betty Turner (now Mrs. Easterbrook), James Winford Wright and Albert Cliff Rainey, for damages for personal injuries received in an automobile collision in Mobile County, Alabama.

The amended complaint consisted of two counts: Count 1 claiming damages for simple negligence, and further alleging that plaintiff was a "passenger for hire" rather than "a guest" in the automobile driven by defendant Betty Turner; Count 2, claiming damages for the willful or wanton misconduct of the defendants. Wright was never served with process and never appeared in the case.

The trial court gave the affirmative charge with hypothesis for Albert Cliff Rainey as to both counts of the complaint. The trial court gave the affirmative charge with hypothesis as to Count One for the defendant Betty Turner, and submitted Count Two, as to Betty Turner, to the jury. The jury returned a verdict for defendant Betty Turner as to Count Two of the complaint. There was a motion for a new trial which was overruled, and plaintiff appealed.

No argument is made for a reversal as to the defendant Rainey, and we will not consider him further.

The broad question, and the only question argued by either party, is the propriety of the giving of the affirmative charge with hypothesis for the defendant Betty Turner as to Count One of the complaint. The answer to that question depends on whether there was enough evidence to take the case to the jury on the question of whether or not Nancy Jeanette Boggs was a "passenger for hire" or a "guest," in the car of Betty Turner at the time she was injured.

The following facts are without dispute:

During the early part of the 1959–60 basketball season, the girl cheerleaders at Vigor High School in Mobile County, Alabama, had attended the school's basketball games without a member of the Vigor High School faculty acting as either sponsor or chaperon. It had been the custom for some of the cheerleaders' parents to accompany the girls, but apparently some of the "kids" had been going by themselves. As a consequence, the principal of Vigor High School required a faculty sponsor to attend the games with the cheerleaders; in other words, the girls could not attend the remainder of the games as cheerleaders without a teacher. The record shows that neither the school nor the school board attempted to appoint a sponsor. The cheerleaders requested Miss Betty Turner, a Vigor faculty member, and appellee here, to act as their sponsor. Since there were 3 or 4 more games, Miss Turner acceded to their request.

The cheerleaders and Miss Turner attended two games together, one requiring a trip to Pensacola, Florida, prior to February 9, 1960. On that date, the Vigor basketball team was to play Baker School. Miss Turner and the cheerleaders were to meet at approximately 6 p. m. that evening at the Vigor School and Miss Turner would transport the girls to the game in her auto-

mobile. They met and proceeded to the game.

Miss Turner was not familiar with the route to Baker School and some of the cheerleaders proposed to show her the way. Miss Turner was directed to the Bear Fork Road, with which she was unfamiliar, and as they continued on the way, there was frivolity and loud talking within the car. Miss Turner approached the Shelton Beach Extension.

At the Bear Fork Road and Shelton Beach Extension intersection, there was a "stop sign," which applied to and stopped the traffic on Bear Fork Road; there was through traffic and no stop sign on the Shelton Beach Extension. As Miss Turner approached this intersection, she was unaware of the stop sign and was made aware of it only after she had entered the intersection, and after it was too late to apply the brakes or to stop. She was proceeding west.

An automobile driven by defendant Wright approached the intersection from the south on the Shelton Beach Extension and ran into the driver's side of Miss Turner's automobile. The impact turned Miss Turner's automobile over and crashed it into the third automobile driven by defendant Rainey, which had stopped but which had been proceeding toward the intersection from the north on the Shelton Beach Extension.

The appellant, Nancy Jeanette Boggs, was one of four cheerleaders in the automobile of appellee Turner. According to appellant's physician, she was severely and seriously injured.

The question of paramount importance is: Was Nancy Jeanette Boggs a "passenger for hire" at the time she was injured, or was she a "guest" under the laws of this state at that time? The answer to that question is determinative of the assignment of error challenging the giving of the affirmative charge for appellee Turner as to Count One of the complaint.

Our so-called "guest" statute, Sec. 95, Title 36, Code of Alabama 1940, reads:

"Liable only for willful or wanton misconduct.—The owner, operator or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest while being transported without payment therefor in or upon said motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the willful or wanton misconduct of such operator, owner or person responsible for the operation of said motor vehicle."

The situation that this statute was apparently designed to prevent is well known. As was said in the case of Blair v. Greene, 247 Ala. 104, 22 So.2d 834:

"* * * As the use of automobiles became almost universal, many cases arose where generous drivers, having offered rides to guests, later found themselves defendants in cases that often turned upon close questions of negligence. Undoubtedly the legislature in adopting this act reflected a certain natural feeling as to the injustice of such a situation. The terms of the statute should be construed with their intent and purpose in view, and the purpose and object that the legislature had in mind sometimes throws light upon the meaning of the language used."

It is well settled in Alabama that in civil cases a count must go to the jury if the evidence or the reasonable inference arising therefrom furnish "a mere 'gleam,' 'glimmer,' 'spark,' 'the least particle,' the 'smallest trace,'—'a scintilla' ", in support of the count. Alabama Great Southern RR. Co. v. Bishop, 265 Ala. 118, 89 So.2d 738, 64 A.L.R.2d 1190. But it is also established in Alabama that where reasonable minds can reach but one conclusion from the uncontroverted facts, the question becomes one of law for the court. Wagnon v. Patterson, 260 Ala. 297, 70 So.2d 244.

■ The evidence in a particular case must determine whether a person riding in the car of another is a "guest" or "passenger for hire." The law relative to the question is clearly stated in the cases of Blair v. Greene, supra; Wagnon v. Patterson, supra; Sullivan v. Davis, 263 Ala. 685, 83 So.2d 434, 59 A.L.R.2d 331; and it would serve no useful purpose to restate it here.

Appellant cites Richards v. Eaves, 273 Ala. 120, 135 So.2d 384, to sustain her position that she was a "passenger for hire" and not a "guest" within the meaning of the guest statute at the time of the collision. But we think that case is distinguishable under its facts from the case at bar.

The real problem presented in the instant case is whether there was a benefit at all to the appellee Turner from her cheerleader-sponsor relationship. If so, was it such a benefit as to make a jury question as to the status of appellant Boggs. If appellant was a "passenger for hire," it must be gleaned by giving the following testimony a most favorable construction to that end.

Mr. McPherson, the principal of Vigor High School, after stating that teachers were not required to serve as sponsors, testified on cross-examination as follows:

"Q. Mr. McPherson, did the fact—did you keep a record or did the school keep a record of the sponsors that were—the sponsors of various groups of cheerleaders?

"A. I don't understand what you mean. Did I record it?

"Q. That's right, in any school record.

"A. No.

*       *       *       *       *       *

"Q. Now, was the fact that Miss Turner at that time served as a sponsor recorded in her personal record with your school?

"A. No.

*       *       *       *       *       *

"Q. Alright now, that's what I'm getting at. When you rate that teacher do you consider in arriving at that teacher's rating her interest in student affairs and student activities?

"A. I only answer the direct questions that are asked on that questionnaire that is sent to me by the superintendent, and there is not a question connected with that particular phase.

"Q. How about interest in her job? Is that—is there any question like that or a related question?

"A. There is a question that indicates whether or not her professional interest is high or low or—

"Q. Alright. Now, in answering your question on her professional interest—do you consider the fact that she has taken an active part in student affairs, student activities, outside of her normal everyday duties?

"A. No, because this is not part of her regular job.

*       *       *       *       *       *

"Q. I'm talking about these activities, such as being a sponsor when you are a teacher, and engaging in student affairs and student activities, do you think that promotes a better relationship between the student and the teacher?

*       *       *       *       *       *

"A. I think it would better the relations with the student that the teacher is in contact with, but not students in general."

The following is cross-examination of appellee Turner:

"Q. And you felt that this would help you on your job to be active with the students and participate in these things, didn't you?

"A. Well, I didn't have the feeling that it would help me in promotion because we are—as I understood it we are—you mean by pay schedule. We are promoted by years taught. It wouldn't help me in pay schedule but I think that in teaching the kids it would make a better relationship in my job, with the faculty and the teachers and all. It would make a better relation and therefore a better situation in teaching.

"Q. That's right, it would make a better teacher out of you, wouldn't it?

"A. Yes, sir, I felt that.

"Q. Isn't that correct? It would make you a better teacher, wouldn't it?

"A. Well, I wouldn't say a better teacher, because—

"Q. Well, would—didn't you say it would improve your relations with the children?

"A. Yes, with my children.

\*    \*    \*    \*    \*    \*

"Q. Alright, would you say that your relationship, having a good relationship with the students, would you say that it did or did not help you as a teacher?

"A. Well, I think that whenever you have a good relationship I think it helps to the extent if you were teaching those kids—

\*    \*    \*    \*    \*    \*

"Q. Alright.

"A. —but I was not teaching any of those kids.

\*    \*    \*    \*    \*    \*

"Q. Alright. Now, inasmuch as you said good relations with students tended to make you a better teacher, didn't you feel that by virtue of these good relations with the students that that would improve your standing as a teacher in the school system?

"A. I can honestly say that I don't think that that was my reason for accepting the—

"Q. No, I asked you—I understand it wasn't your reason, but didn't you feel that that improved your standing as a teacher in the school system?

"A. No, I did not feel that because the way that we had been explained as being rated I didn't think it would impress Mr. McPherson or the higher ups or help my rating in that line."

■ We are clear to the conclusion that under the law of this state the present benefits, if any, which were derived by appellee Turner from the sponsor cheerleader relationship was so nebulous and intangible, and that any anticipated future benefits were so speculative and dependent on future circumstances, that there was not, as a matter of law, enough benefit to the appellee Turner to remove the appellant Boggs from the influence of the guest statute, and she was, therefore, a guest. Sec. 95 of Title 36, Code 1940, was applicable and excluded appellee Turner from liability under the count for simple negligence, and the court properly gave the affirmative charge with hypothesis for the appellee Turner as to Count One of her complaint.

The case is due to be, and is, affirmed.

Affirmed.

LAWSON, MERRILL and COLEMAN, JJ., concur.