The father of a minor son killed in a motor-vehicle accident while a passenger in an automobile operated by his maternal grandmother, who was also killed in the collision, appeals from a summary judgment entered in favor of the grandmother's estate in the father's wrongful-death action. We affirm.
Steven Tolbert was the 14-year-old son of Darryl Tolbert and Candis Tolbert, who were divorced. Although Darryl had been awarded legal custody of Steven, the boy lived primarily with Candis in Cullman. Steven was being "homeschooled," although Candis worked in Huntsville at a job to which she had to report by 8:00 a.m. each day, and from which she frequently did not return home until 6:00 p.m. Candis's mother, Anna Jane Key, who was retired, stayed at Candis's house every week Monday through Thursday. She supervised the homeschooling and otherwise cared for Steven during the day. On Fridays Ms. Key would visit Candis's sister in Atlanta; Steven often went with her. Ms. Key and Steven were quite close, and while Candis was at work, Ms. Key was Steven's primary caregiver.
On the morning of the accident, July 25, 2000, Candis left for work as usual and mid-morning Ms. Key drove her car, accompanied by Steven, to pick up his best friend, Chris Givens; she then returned with the two boys to Candis's house. During that day Chris helped Steven with his homework, and the boys accompanied Ms. Key while she drove her car to run some errands. Early that evening, while it was still daylight, Ms. Key, accompanied by Steven, drove Chris home. A light rain had begun to fall. The route to Chris's house, which Ms. Key had traveled a few times during the preceding year carrying Chris to and from his house, was uphill on a double "S" curve on Highway 278 West. After dropping Chris off at his house, Ms. Key began the return trip, traveling eventually downhill and into the portion of the road forming the double "S" curve. Ms. Key lost control of the car on the rain-slicked roadway; it slid into the opposing lane of traffic and collided with another vehicle, resulting in the death of the driver of that vehicle, Steven, and Ms. Key.
State troopers who investigated the accident concluded that Ms. Key's "driving was improper for the conditions." The posted speed limit was 55 miles per hour. There were no skid marks on which the troopers could base an estimate of Ms. Key's speed, but one of them was of the opinion "that for whatever reason she was driving improper for the environment and was unable to negotiate the curve. . . . [I]t's my opinion that for whatever reason that Ms. Key as the primary contributor was at fault in this crash." There was no evidence from which the troopers could conclude that Ms. Key was driving in excess of the speed limit; whether she was traveling 40 miles per hour or 60 miles per hour simply could not be estimated according *Page 106 
to one of them, but "they're all possibilities." The downhill stretch of road Ms. Key was traveling involved "a fairly steep grade" and fairly significant curves. At the top was a warning sign reading: "Sharp curve ahead. Trucks must slow to 35 mph." Horace Elmore, a motorist following behind the truck with which the Key automobile collided, causing it to hit Elmore's vehicle, testified that he was traveling up the steep grade when:
 "I seen a gray car shoot around the curve and it looked like that she didn't never even — she didn't even — the car never did even start to make a curve. It just went straight across almost like it was headed toward the guardrail and it looked like that maybe she might have got control of it and it come back across the road and then it went into a spin and come spinning down the hill and hit the little truck in front of me.
". . . .
 "Well, I don't know if it was — you know, generally when a car goes into a skid it speeds up. And I don't know if the car was skidding when it come around through there so fast or whether she was just — but I'm just estimating, you know, and I would say that she was probably going over the — about 60 miles an hour."
Darryl asserts on appeal that the trial judge erred in several different respects involving venue and the merits of his wrongful-death action. We address each of those contentions.
 I. Venue
Darryl filed this action in the Etowah Circuit Court, but consented to its transfer to the Cullman Circuit Court after the defendant, "the estate of Anna Jane Key" (hereinafter "the estate"), moved the Etowah Circuit Court to transfer the case based on the assertions that Ms. Key "was a resident of Cullman County, Alabama, at the time of the motor vehicle accident made the basis of this action" and that her estate was "being administered in the Probate Court of Cullman County, Alabama." (Letters of administration were granted to Candis as administratrix of the estate by the Probate Court of Cullman County on September 14, 2000.) Subsequently, Darryl moved the Cullman Circuit Court to transfer the case back to Etowah County, based on the fact that the estate, in answering an interrogatory, had identified Ms. Key's "home address at the time of her death" as an address in Gadsden, Etowah County, Alabama. Candis later explained in her deposition, however, that after her mother retired, she "didn't ever stay at home — at her house"; rather, "she had been either with me or my sister continuously." The Cullman Circuit Court denied the motion to transfer the case back to Etowah County.
Darryl argues in his brief to this Court that venue was proper where Ms. Key resided or where the accident occurred, citing §6-3-2(a)(3), Ala. Code 1975, which provides that all "personal actions" of this type "against individuals" may be brought in the county where the defendant "has within the state a permanent residence" or in the county in which the act or omission occurred. As the estate points out in its brief, however, venue of actions against estates is governed not by § 6-3-2, but by § 43-2-130, which provides, in pertinent part, that "[c]ivil actions may be brought against executors or administrators in their representative character, in all cases, in the county in which letters were granted." In Ex parte Wiginton, 743 So.2d 1071,1073 (Ala. 1999), this Court observed:
 "The defendants in this case are of three types: corporations, a natural person (or `individual'), and an executrix. Venue as to these three types of defendants is addressed by separate statutes. *Page 107 
". . . .
 "[Defendant] Mildred E. Kennedy is an executrix. The venue statute applicable to her is § 43-2-130. . . ."
Darryl claims that "[t]he case was moved [to Cullman County] based on a false allegation," but the grant of letters of administration to Candis by the Cullman Probate Court stands, and Darryl's attempt at a collateral indirect attack on the grant of letters of administration is procedurally impermissible. "Where the fact of inhabitancy does not exist, the grant of administration is not void, but may be avoided by a direct proceeding for that purpose." Holmes v. Holmes, 212 Ala. 597,599, 103 So. 884, 886 (1925). Furthermore, "[c]ourts of probate, within their respective counties, have authority to grant letters of administration on the estate of persons dying intestate . . . [w]here the intestate, at the time of his death, was an inhabitant of the county." § 43-2-40(1), Ala. Code 1975. Given the circumstances of Ms. Key's living arrangements at the time of her death, Darryl has not established that his consent to the transfer of the action to Cullman County was "based on a false allegation."
Darryl has shown no error with respect to the trial court's refusal to transfer the case back to Etowah County.
 II. The Merits
The summary-judgment order entered by the trial court stated:
 "There being no evidence of wantonness on the part the Defendant and the motion being well taken and there being no genuine issue of fact or law and the Defendant being entitled to Judgment as a matter of law, Summary Judgment is hereby entered for the Defendant and against Plaintiff."
 A. Constitutionality of the Guest Statute
At a point in the proceedings, Darryl filed a "Constitutional Challenge of the Guest Statute."[1] Section 32-1-2, Ala. Code 1975, commonly known as the guest statute, was enacted by the Legislature in 1935. It reads:
 "The owner, operator or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest while being transported without payment therefor in or upon said motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the willful or wanton misconduct of such operator, owner or person responsible for the operation of said motor vehicle."
Darryl contended that the guest statute violates §§ 13 and 22
of the Alabama Constitution and Amendment 14 of the United States Constitution. He acknowledged that this Court had rejected identical constitutional challenges to the guest statute inPickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), andBeasley v. Bozeman, 294 Ala. 288, 315 So.2d 570 (1975). Darryl's argument then, and now, is that societal and legal changes occurring subsequent to Beasley justify revisiting and overruling that case and Pickett. In his brief to this Court, Darryl cites a California case and a Texas case as support for his position that we should overrule Pickett and Beasley:Brown v. Merlo, 8 Cal.3d 855, 506 P.2d 212, 106 Cal.Rptr. 388
(1973), and Whitworth v. Bynum, 699 S.W.2d 194 (Tex. *Page 108 
1985). Merlo was decided two years before this Court decidedBeasley and was specifically noted in that opinion, the Court concluding, nonetheless, that
 "under the distribution of powers section of our State Constitution, it is within the province of the Legislature to ascertain and determine when the welfare of the people might require that the guest statute should be repealed. The Legislature's power should not be interfered with unless it is exercised in a manner which plainly conflicts with some higher law. Pickett v. Matthews, supra.
294 Ala. at 290, 315 So.2d at 571.
Justice Jones wrote an opinion concurring specially inBeasley, which two other Justices joined, in which he questioned the wisdom of the guest statute, but in which he also expressed his strong belief "in the wisdom of the separation of powers doctrine which is the foundation of our system of government. . . ." Justice Jones continued:
 "[T]he Court is powerless to strike down as invalid a legislative act unless such act is constitutionally prohibited or otherwise violative of constitutional proscriptions. The legislative process, through elective representatives, with all of its faults, and its tendency to be unduly influenced by pressure groups, is the best method yet derived by man for the enactment of laws expressive of the public policy of its people. (I would add parenthetically: My faith in this process further leads me to believe that a legislature sensitive to the will of the people it represents will now exercise its prerogative to repeal this inherently bad law.)"
294 Ala. at 291, 315 So.2d at 571.
Despite Justice Jones's express invitation, the Legislature has chosen not to repeal the guest statute.
In Whitworth, the Texas Supreme Court noted, as had this Court in Beasley, that the United States Supreme Court had upheld the right of states to enact guest statutes, as against a claim that such statutes violated the Equal Protection Clause of the Fourteenth Amendment. In Silver v. Silver, 280 U.S. 117,50 S.Ct. 57, 74 L.Ed. 221 (1929), the Supreme Court found a rational distinction between gratuitous passengers in automobiles and guests in other modes of transportation. In Whitworth, the Texas Supreme Court acknowledged the continued authority ofSilver with regard to the equal-rights provision of the United States Constitution but concluded that it was at liberty to interpret differently the equal-protection clause appearing in the Texas Constitution, which provides: "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."699 S.W.2d at 196 n. 1. The Court declared that "we are at liberty to interpret state statutes in light of our own constitution and to fashion our own tests to determine a statute's constitutionality." 699 S.W.2d at 196. The Texas guest statute, as revised in 1973, discriminated against only guest passengers who were "`related within the second degree of consanguinity or affinity to the owner or operator of a motor vehicle.'"699 S.W.2d at 195. Pointing out that "[e]ven when the purpose of a statute is legitimate, equal protection analysis still requires a determination that the classifications drawn by the statute or rationally related to the statute's purpose," the court concluded that the classification system of the revised statute lacked such rationality:
 "The Texas Guest Statute creates a presumption that all automobile passengers suing a driver who is within the second degree of affinity or consanguinity *Page 109 
do so collusively. We refuse to indulge in the assumption that close relatives will prevaricate so as to promote a spurious lawsuit."
699 S.W.2d at 197.
 "The question whether §§ 1, 6, and 22 of Article I, Constitution of Alabama 1901, combine to guarantee the citizens of Alabama equal protection under the laws remains in dispute. See Black v. Pike County Comm'n, 360 So.2d 303 (Ala. 1978); Ex parte Jackson, 516 So.2d 768 (Ala. 1986), and Ex parte Branch, 526 So.2d 609 (Ala. 1987) (implying that those provisions do provide for equal protection); but see Ex parte Melof, 735 So.2d 1172 (Ala. 1999)."
Hutchins v. DCH Reg'l Med. Ctr., 770 So.2d 49, 59 (Ala. 2000).
Darryl does not argue that Art. I, §§ 1, 6, and 22, Alabama Constitution of 1901, combine to guarantee the citizens of Alabama equal protection under the laws. Rather, he argues that the guest statute is unconstitutional because it violates § 22
and § 13 of the Alabama Constitution and the Equal Protection Clause of the United States Constitution, his argument consisting simply of the following:
 "The Alabama Guest Statute is unconstitutional for the following reasons:
 "1. The Alabama Guest Statute is a derogation of the common law.
 "2. The Alabama State Constitution guarantees a remedy for any injury, which includes injuries to guests:
 "`Sec. 13. Courts to be open; remedies for all injuries; impartiality of justice.
 "`That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay.'
 "3. The Alabama Constitution forbids any grant of privilege or immunity:
 "`Sec. 22. Ex post facto laws; impairment of obligations of contracts irrevocable or exclusive grants of special privileges or immunities.
 "`That no ex post facto law, nor any law impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant of franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment.'
 "4. The Guest Statute violates the Equal Protection Clause of the U.S. Constitution.
 "5. There is no rational basis between `guest' and other passengers. All guests and passengers should receive the benefit of the driver's insurance when the driver is negligent.
 "As applied to this case, the Alabama Guest Statute is unconstitutional because it only protects the insurance company and there is no rational basis between `guests' and passengers. Anna Key, the grandmother, is dead. The insurance company of Anna Key is the only beneficiary of the Guest Statute in this case. Anna Key has no estate and there will be no recovery against the estate unless her insurance company is held responsible."
(Appellant's brief, pp. 30-32.)
Merely quoting § 13 and § 22, Ala. Const. 1901, without citing or discussing relevant caselaw, falls far short of argument adequate to demonstrate that Pickett and Beasley were wrongly decided with respect to the effect of §§ 13 and 22. Butler v.Town of Argo, 871 So.2d 1, 20 (Ala. 2003) ("Furthermore, `it is not the *Page 110 
function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.' Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251
(Ala. 1994) (citing Spradlin v. Spradlin, 601 So.2d 76 (Ala. 1992))."). See also Orkin Exterminating Co.v. Larkin,857 So.2d 97 (Ala. 2003); Crutcher v. Wendy's of North Alabama, Inc.,857 So.2d 82 (Ala. 2003).
Likewise, the naked statement that "[t]he Guest Statute violates the Equal Protection Clause of the U.S. Constitution," falls far short of demonstrating that we should presume Silverv. Silver to no longer be controlling authority.
 B. Applicability of the Guest Statute to a Claim of Negligent Supervision
In Standifer v. Pate, 291 Ala. 434, 282 So.2d 261 (1973), a year-and-half-old infant pulled a skillet of hot grease off a counter onto himself while he was being cared for by a volunteer babysitter at her residence. This Court concluded that by undertaking to supervise, watch, and care for the child, the babysitter had bound herself to the exercise of due care in those activities. Acknowledging that "the recognized duty owed by an occupier of land in Alabama to a licensee is not to wilfully or wantonly injure him, or not to negligently injure him after discovering him in peril," the Court explained that that duty "in no way abrogates or insulates a land occupier from duties which arise from other relationships between himself and another on his premises." 291 Ala. at 436, 282 So.2d at 263.
 "The place at which such supervision occurred should not affect the duty owed the plaintiff. The location of the alleged breach of duty is unimportant, whether it occurred on the plaintiff's premises or elsewhere.
". . . .
 ". . . The occurrence of the breach of duty on one's own premises is a mere fortuity."
291 Ala. at 436, 282 So.2d at 263. The Court pointed out that it had recently held in Beasley v. MacDonald Engineering Co.,287 Ala. 189, 249 So.2d 844 (1971), that a volunteer undertaking a gratuitous safety inspection of business premises was under a duty "once he has acted or assumed the duty, to execute the task undertaken with reasonable care." 291 Ala. at 437,282 So.2d at 263. Accordingly, having undertaken to supervise the activities of the child, the volunteer babysitter necessarily incurred the duty to exercise due care in the undertaking.
Darryl argues that the guest statute has no application to a claim of negligent supervision even if the breach of the duty to exercise due care involves the operation of a motor vehicle. In that regard Darryl relies on this statement in Walker v.Garris, 368 So.2d 277, 280 (Ala. 1979): "The guest statute is inapplicable to a claim for negligent supervision of children even though the instrumentality which inflicted the harm may have been a `motor vehicle.'" That statement must be understood in context, however. In Walker, the defendant Garris held a hayride for a church youth group consisting of some 15 to 25 children, including 13-year-old Lisa Walker. Garris provided a flatbed trailer loaded in the center with bales of hay. The children sat around the hay bales "towards the edge of the trailer" and "[t]here were no fenders over the trailer's wheels, and there were no sides, railings, or handholds."368 So.2d at 278. Garris pulled the trailer with his pickup truck, accompanied by another adult. No adults were on the trailer with the children during the hayride, and there was testimony "that some of the children at various times were *Page 111 
dangling their feet over the edge and jumping on and off the trailer as it moved at a slow speed" down the roadway.368 So.2d at 278. Garris and his adult companion in the pickup truck neither observed these activities nor instructed the children to stop them. "Lisa somehow got off the trailer and was run over by it," sustaining personal injuries. 368 So.2d at 278. There was no claim that Garris had negligently or wantonly operated his pickup truck or the trailer being pulled behind it, or that he had in any other way driven improperly. Rather, the complaint filed in the ensuing personal-injury action alleged simply that Garris "so negligently conducted said hayride on said highway at said time and place" as to allow Lisa to fall off and be run over by the trailer. 368 So.2d at 279.
 "These allegations are sufficient to state a claim for relief under Standifer v. Pate, 291 Ala. 434, 282 So.2d 261 (1973). In that case we held that a volunteer babysitter on her own premises owed a duty of due care in supervising a child under her care and control, thereby overruling Nelson v. Gatlin, 288 Ala. 151, 258 So.2d 730 (1972). In Standifer we noted that the gist of the action is negligent supervision. When an individual undertakes the control and supervision of a child, reasonable care must be exercised to protect that child from injury, irrespective of compensation. Garris was under no obligation to hold a hayride for these children, but once he undertook to do so he was under a duty to conduct the hayride properly by providing a suitable conveyance for the hayride and by controlling and supervising the children so as to protect them from injury. The guest statute is inapplicable to a claim for negligent supervision of children even though the instrumentality which inflicted the harm may have been a `motor vehicle.' The duty is to supervise the children properly, and an individual should not be allowed to escape liability simply because the child is injured by a motor vehicle rather than a hot pan of grease as in Standifer.
 "Sufficient evidence was presented for a jury to find that Garris was negligent in the manner in which he conducted the hayride."
368 So.2d at 279-80 (emphasis supplied).
As can be seen, Walker involved a claim of negligent supervision totally separate from and independent of the manner in which the motor vehicle (and the towed trailer) were operated. The duty alleged to have been breached was not a duty imposed by law on the operator of a motor vehicle as to third parties, but rather was the duty imposed by law on one who voluntarily undertakes to supervise children. Consequently, as inStandifer, the duty owed by Garris, as the operator of a motor vehicle, in no way abrogated or insulated him from the duty he owed as a volunteer adult supervisor of a child. It was that latter duty he breached by failing to use due care in its execution, rather than the separate duty he owed arising from his status as the operator of a motor vehicle.
In the present case Darryl does not argue that Ms. Key failed to use due care in supervising Steven, apart from the fact that he was a passenger in her automobile when she is alleged to have negligently or wantonly operated it. Thus, the duty implicated is not a duty she owed Steven as his supervisor; rather, it is the separate duty she owed him arising from their relationship as automobile operator and passenger. That duty, and its breach, are governed by the guest statute. There is no allegation that Steven was engaging in any conduct or activity that posed a danger to him, or that Ms. Key, in the exercise of her duty to use *Page 112 
due care in supervising him, should have monitored or curtailed. For all that appears, Steven was simply passively present in the automobile, requiring no particular control or supervision. Accordingly, we understand the statement in Walker that "[t]he guest statute is inapplicable to a claim for negligent supervision of children even though the instrumentality which inflicted the harm may have been a `motor vehicle,'"368 So.2d at 280, to mean that the claim being asserted must actually relate to some negligence in the supervision of the child, thus implicating the duty the supervisor owes as a result of that relationship to exercise due care. Here Darryl argues no such claim, other than the idea that while Steven was under the continuing supervision of Ms. Key, as a passenger in her automobile, she negligently or wantonly operated that vehicle.
 C. Applicability of the Guest Statute to a 14-year-old Child
In Walker, this Court held "that the applicability of the guest statute to a child under fourteen is a jury question."368 So.2d at 279. Steven was born on November 22, 1985; he was 14 years and 8 months old at the time of the accident on July 25, 2000.
In Fox v. Hollar Co., 576 So.2d 223 (Ala. 1991), an action was filed on behalf of an 11-year-old boy against The Hollar Company and others stemming from personal injuries the boy received as the result of a traffic accident that occurred while the boy was riding as a passenger in a tanker truck owned by Hollar and being driven by the boy's father, an employee of Hollar. Following a verdict for the defense, the plaintiff appealed, arguing, among other things, that the trial court had erred in submitting to the jury the question whether the boy was a "guest" within the meaning of the guest statute. This Court noted that "[t]he relationship between a host and a guest is consensual in nature and involves some acceptance by the guest of the relationship and its attendant hazards" and stated that the question presented was whether the 11-year-old boy "was legally capable of giving his consent to ride in the Hollar tanker truck driven by [his father] so as to bring him within the guest statute." 576 So.2d at 226. The Court noted that in Walker it had "adopted the position that the question whether a child under 14 is subject to the guest statute is to be determined by the factfinder, based on the individual child's capacity to consent."576 So.2d at 226.
Darryl does not argue that Steven was not as intelligent or perceptible as any other boy his age or that he was otherwise mentally incapable of consenting to the status of automobile guest; rather, he argues only that whether a child that age could become a guest is always a jury question. In this case the facts are undisputed. Candis testified that "Steven was smart" and was "able to appreciate any particular danger." Ms. Key had transported Chris simply because he was Steven's best friend and was going to help him with his homework.
 "Whether one is a `guest' within the meaning of this [the guest] statute is ordinarily a question of fact for the jury; however, where reasonable minds can reach but one conclusion from the evidence, the question becomes one of law for the court. Harrison v. McCleary, 281 Ala. 87, 199 So.2d 165 (1967)."
Davis v. Davis, 622 So.2d 901, 902 (Ala. 1993). "If the only benefits received by a driver are those such as are incidental to goodwill, then the passenger is a `guest' within the meaning of the statute." Id.
In Walker, we observed that "[s]everal of our cases have properly applied the [guest] statute against minors over the age of 14. See e.g. Boggs v. Turner, *Page 113 277 Ala. 157, 168 So.2d 1 (1964); Shirley v. Shirley, 261 Ala. 100,73 So.2d 77 (1954)." 368 So.2d at 279. In Boggs v. Turner,277 Ala. 157, 168 So.2d 1 (1964), the age of the injured minor passenger is not specifically stated, but she is identified as one of the "girl cheerleaders at Vigor High School in Mobile County, Alabama," and referred to as one of "the kids" and one of "the children." As noted, this Court, having access to the record in Boggs, indicated in Walker that she was over the age of 14. In Boggs, the Court held "that there was not, as a matter of law, enough benefit to the appellee [defendant motor-vehicle operator] to remove the appellant [student cheerleader] from the influence of the guest statute, and she was, therefore, a guest."277 Ala. at 161, 168 So.2d at 5.
Our caselaw relating to a minor's capacity for contributory negligence is instructive by analogy. In Aplin v. Tew,839 So.2d 635, 639 (Ala. 2002), we affirmed a judgment as a matter of law entered on the ground that the 14-year-old plaintiff had been contributorily negligent. The plaintiff argued that he should not be held to the same standard of contributory negligence to which we would hold an adult.
 "The question of contributory negligence is normally one for a jury. However, where the facts are such that all reasonable persons must reach the same conclusion, contributory negligence may be found as a matter of law. . . .
". . . .
 "[The minor plaintiff] is correct that we apply a different standard to children below the age of 14. A child between the ages of 7 and 14 is prima facie incapable of contributory negligence. Superskate, Inc. v. Nolen, 641 So.2d 231, 236 (Ala. 1994); Savage Indus., Inc. v. Duke, 598 So.2d 856, 858
(Ala. 1992). However, at the time of the accident, [the minor plaintiff] was already 14 years old and was about to enter the ninth grade. Thus, [the minor plaintiff] was capable of contributory negligence."
839 So.2d at 638-39.
Because the facts of this case present no jury question with regard to the applicability of the guest statute to Steven, apart from the issue of his capacity to consent to being a passenger and because he was over the age of 14 and of at least ordinary intelligence and perception for that age, the guest statute was applicable to him as a matter of law.
 D. Wantonness
Darryl asserts that it was error for the trial court to enter a summary judgment for the estate with respect to his claim that Ms. Key was operating her vehicle "wantonly" on the occasion complained of. He argues that he submitted substantial evidence of her wantonness in the form of these facts:
 "Anna Key had notice of the existence of a dangerous double s-shaped curve on Highway 278 West. She had just driven through the curve going uphill. Minutes later in a light rain, she drove through the same dangerous curve at a high rate of speed. She lost control of her vehicle. The vehicle skidded out of control into the oncoming lanes of traffic striking two oncoming vehicles. Both passengers of the vehicles were killed. Such facts constitute substantial evidence of wantonness."
(Appellant's brief, p. 34.)
Our standard of review in this regard and the essential elements and characteristics of "wantonness" were thoroughly detailed in Ex parte Anderson, 682 So.2d 467, 469-70 (Ala. 1996):
 "In reviewing the disposition of a motion for summary judgment, we utilize the same standard as the trial court in determining whether `the evidence before *Page 114 
[it] made out a genuine issue of material fact' and whether the movant was `entitled to a judgment as a matter of law.' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988); Rule 56(c), [Ala.]R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. South Trust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990).
 "Anderson [the motor-vehicle operator] argues that Hughes [the passenger] did not present substantial evidence to defeat the defendant's properly supported motion for summary judgment. In order to hold a defendant liable under Alabama's Guest Statute, a plaintiff must show that the defendant's actions amounted to wanton conduct. The Alabama Guest Statute, codified as § 32-1-2, Ala. Code 1975, states:
 "`The owner, operator or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest while being transported without payment therefor in or upon said motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the willful or wanton misconduct of such operator, owner or person responsible for the operation of said motor vehicle.'
 "The purpose of this statute is `to prevent generous drivers, who offer rides to guests, from being sued in what often are close cases of negligence.' Roe v. Lewis, 416 So.2d 750, 753 (Ala. 1982) (citing Blair v. Greene, 247 Ala. 104, 22 So.2d 834 (1945)). In a case subject to the Guest Statute, a plaintiff's showing of `wanton misconduct' requires more than a showing of some form of inadvertence on the part of the driver; it requires a showing of some degree of conscious culpability. George v. Champion Ins. Co., 591 So.2d 852 (Ala. 1991).
 "What constitutes wanton misconduct depends on the facts presented in each particular case. Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala. 1989); Brown v. Turner, 497 So.2d 1119
(Ala. 1986); Trahan v. Cook, 288 Ala. 704, 265 So.2d 125 (1972). A majority of this Court, in Lynn Strickland Sales Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala. 1987), emphasized that wantonness, which requires some degree of consciousness on the part of the defendant that injury is likely to result from his act or omission, is not to be confused with negligence (i.e., mere inadvertence):
 "`Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury. . . .
 "`Negligence is usually characterized as an inattention, thoughtlessness, *Page 115 
or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act. "Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted." McNeil v. Munson S.S. Lines, 184 Ala. 420, [423], 63 So. 992 (1913). . . .
"`. . . .
 "`"Willful and wanton conduct has a well-defined meaning at law. It is sometimes expressed in terms of `reckless disregard of the safety of another.' Willful and wanton conduct should not be confused with negligence. It has been correctly stated that the two concepts are as `unmixable as oil and water.'"
"`. . . .
 "`". . . Willfulness or wantonness imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act, and strictly speaking, is not within the meaning of the term `negligence,' which conveys the idea of inadvertence, as distinguished from premeditation or formed intention."'
 "510 So.2d at 145-46 (citations omitted.) See also, Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala. 1989)."
This Court held in Anderson that Hughes, the passenger, had not presented substantial evidence of wantonness on the part of Anderson, the operator of the motor vehicle, where all that was shown was that a collision occurred when Anderson, "attempting to turn left at an intersection, crossed in front of an oncoming lane of traffic" at a time when "Anderson could not see if any traffic was approaching her as she turned, because her vision was partially blocked by an automobile, which was waiting to turn left in the opposite left-turn lane." 682 So.2d at 469. In her supporting affidavit, Anderson had stated that she waited at the intersection until she believed that it was safe to turn.
 "Although Anderson may have been negligent in turning left while her view of the oncoming traffic was blocked, we do not believe that this evidence is sufficient to prove that she was guilty of `wanton conduct,' as that term is defined in our cases. In other words, viewing the evidence most favorably to Hughes, we find no substantial evidence that the defendant Anderson acted `with knowledge of danger, or with consciousness, that the doing [of the act would] likely result in injury.' Lynn Strickland, 510 So.2d at 145."
682 So.2d at 470.
Darryl distinguishes Anderson on the basis that, through her affidavit, "Anderson presented direct evidence of a lack of wantonness." He relies on two other decisions of this Court to support his contention that the circumstances under which Ms. Key lost control of her automobile constitute substantial evidence of wantonness — Sellers v. Sexton, 576 So.2d 172 (Ala. 1991), andScott v. Villegas, 723 So.2d 642 (Ala. 1998). In Sellers, another guest-statute case, the automobile driver was proceeding along a highway with which she was intimately familiar on a day in January when travel advisories had been issued because of expected inclement weather and the possibility of freezing precipitation. The day before, the county engineer's office had placed a coarse type of slag on several bridges in anticipation of the freezing weather. The route the driver and her passenger were traveling took them across a series of three bridges. She *Page 116 
was traveling "at or about the maximum legal speed of 55 m.p.h. when she crossed the first of the three bridges."576 So.2d at 173. She observed that there was loose rock and stone on that bridge. "[S]he did not slow down as she approached the second bridge," although "[s]he acknowledged that she normally slowed down before entering this bridge because of a wide curve to the left." 576 So.2d at 173. Upon entering the second bridge, she lost control of her car, "first pulling to the right and then, in an attempt to correct the direction of the vehicle, steering to the left and traveling completely into the lane of oncoming traffic." 576 So.2d at 173. The ensuing collision resulted in the death of the passenger. This Court concluded that the evidence, establishing that the driver proceeded onto the second bridge while continuing her speed at or near the maximum posted speed limit, at a time when she "should have known" that the bridge had been spread with slag in preparation for the bad weather and with knowledge that there was a wide curve that would obstruct her view of any oncoming traffic constituted substantial evidence to support the wantonness claim. 576 So.2d at 175.
In Scott, Villegas was driving an automobile he had just purchased and that he had driven only one time previously. Scott, his passenger, had driven the automobile several times while it was owned by the seller. Villegas was well aware that the vehicle (a 1990 Ford GT-50) was "souped up," with a 5-speed transmission and a V-8 engine. "According to the Villegas, `it was a fast car . . . It was bad.'" 723 So.2d at 643. In pulling out of the driveway at the start of the trip, Villegas stalled the automobile, and Scott asked if he could drive. Villegas refused. As Villegas then drove the car down the road, he "spun off" because, as he later explained, he was not used to the "tight gears," which required that the driver give the engine some gas. Accordingly, he "fishedtail[ed] a little bit." 723 So.2d at 643. It had been raining and the roads were wet. Scott again asked if he could drive and Villegas declined, stating that he wanted to drive his own car. Next, at an intersection Villegas "`gave it a little too much gas and it spun a little bit more.'"723 So.2d at 643. Scott again asked if he could drive and Villegas again insisted on driving. At another intersection Villegas spun off again. He then told Scott "`[i]f I mess up one more time, you can drive the car.'" Id.
 "Subsequently, `because [Villegas and Scott were] in a hurry to get' to [their] destination, [Villegas] shifted from fifth gear into third gear and passed another automobile; Villegas's automobile went into a spin, struck another automobile, spun some more, and turned over. When Villegas was asked what he thought caused the spin, he testified as follows:
 "`I believe that when I did it — well, it was a wet road. And I believe it hydroplaned or, then again, it was a lot of power. I did turn it over. And right when I turned the steering wheel, when I was switching lanes, my car spinned. It went sideways.
"`. . . .
"`I was going normal speed.
"`. . . .
"`45 [mph]. Because I just threw it down.
"`. . . .
 "`[W]hen I shifted up, the RPM gauge went up and I gave it a little more power, and that's what happened.'"
723 So.2d at 643-44.
The Court concluded that "there is substantial evidence from which the jury could find that Villegas acted with a reckless or *Page 117 
conscious disregard of the rights or safety of others by consciously driving the automobile while knowing that he could not control it on the wet pavement and knowing that if he lost control of it, injury would likely or probably result."723 So.2d at 644.
As noted, this Court observed in Ex parte Anderson, supra, that "[w]hat constitutes wanton misconduct depends on the facts presented in each particular case." 682 So.2d at 470. As also noted, Darryl contends in his brief that it is undisputed that Ms. Key was driving "at a high rate of speed."
Darryl's expert witness, Rodney Pack, a qualified accident reconstructionist, reviewed the various reports concerning the accident, reviewed photographs of the accident site, and visited the site on two occasions. He stated that he had made no determination concerning Ms. Key's speed at the time of the accident. He concluded that the accident was caused by driver error in the sense that Ms. Key, aware of the existing road conditions, failed "to reduce her speed according to the situation I would think would be — not necessarily speed, but failure to acclimate her vehicle to the condition at the time," i.e., the steep grade, the sharpness of the curve, and the rain. Asked if that environment would present "a situation where anyone going down that hill would have lost control at or about the speed limit," Pack answered "Yes, there is nothing to prevent somebody from losing control." Pack acknowledged that he had not concluded that Ms. Key "was doing any kind of reckless driving or excessive speed or anything of that nature" and reiterated his acknowledgment that the accident could have occurred had an individual been coming down the hill at or about the speed limit.
As discussed earlier, the investigating state troopers likewise concluded that the accident was the result of driver error, in that Ms. Key might have been driving too fast for the conditions, but they acknowledged that there was no indication that Ms. Key was exceeding the speed limit at the time of the accident. One of the troopers was allowed to testify without objection that he had found no evidence indicating that Ms. Key "consciously took any action that she knew was going to cause injury to anyone out there that day."
Chris Givens testified that he had ridden with Ms. Key on a number of occasions and had never seen her speeding or driving recklessly and that as she was driving him home on the occasion in question, she was driving within the speed limit; as she drove up the hill to his house, she was proceeding "under the speed limit anywhere from 40 to 50."
One of the troopers testified on deposition that he believed "it was drizzling when the wreck happened." According to this trooper, "a lot of time when a drizzle first begins because of a specific gravity, the oil will float on top of the water and most things will float, and a washing rain will basically wash that off but a light drizzle will bring that to the surface and at that point it's usually slippier than it would be if you had a washing rain." Asked if such a condition normally surprised people, the trooper answered, "Absolutely" and stated that he "certainly considered the roadway condition to be a contributing factor to the wreck."
Darryl's contention that the evidence that Ms. Key was proceeding at a high rate of speed is "undisputed" is necessarily based on the statements by witness Horace Elmore quoted earlier. Elmore's observations boil down to the fact that he could not say whether Ms. Key's car was already "skidding when it came around through there so fast," but he knew that "generally when a car goes into a skid it *Page 118 
speeds up," and when he saw the car it was probably going about 60 miles per hour in his estimation. These qualified opinions would not constitute substantial evidence that Ms. Key was in fact exceeding the speed limit immediately before she lost control of her vehicle and went into a spin.
Elmore was emphatic that he had "seen too many wrecks there. If you don't slow down in that curve, you are going to wreck and that's all there is to it." Elmore traveled the road everyday going to and from work and knew "there has been a lot of people killed there. A lot of people killed there." He was "surprised that the State Road Department hasn't done something to [the road] years before, because so many accidents had occurred on it." He stated: "As a matter of fact my neighbor almost got killed there a few months back, same spot. Very same spot." Elmore knew that it was "just a real slick road when it rains," and that on the occasion in question "it had just started raining" and the road was "very slick."
In both Sellers and Scott the operators of the motor vehicle survived the collision and were able to acknowledge in testimony their consciousness and appreciation of the attendant circumstances, including road conditions, that made their driving choices dangerous. In the present case, the fact-finder, even when viewing the facts most favorably to Darryl, could not conclude, other than as a matter of speculation, that Ms. Key had been exceeding the 55 miles-per-hour speed limit before she lost control of her vehicle. Clearly, she lost control of her vehicle through "driver error" relating to her failure to appreciate the hazard created on the curving downhill road by the slickness of the road surface resulting from the recent light rain. In the final analysis, it cannot be said that this evidence establishes "more than a showing of some form of inadvertence on the part of the driver" or that it rises to the required showing of "some degree of consciousness on the part of the defendant that injuries are likely to result from his act or omissions." Exparte Anderson, 682 So.2d at 469-70. Therefore, the summary judgment as to the wantonness claim was not error.
 III. Conclusion
Accordingly, for all of the reasons discussed above, we affirm the summary judgment in favor of the estate.
AFFIRMED.
NABERS, C.J., and SEE, BROWN, and STUART, JJ., concur.
[1] A copy of the challenge was duly served upon the attorney general of the State of Alabama who filed, albeit after the summary judgment was entered, his "Acceptance and Waiver" waiving further service of pleadings and discovery and waiving the right to be heard. See § 6-6-227, Ala. Code 1975; Terry v. City ofDecatur, 601 So.2d 949 (Ala. 1992).