Angela Carr Berry appeals from a partial summary judgment entered in favor of Tammie Sherie Fife on Berry's claim of wantonness arising out of a motor vehicle accident involving Berry and Fife. We reverse and remand.
On January 30, 1990, Berry sued Fife, alleging that Fife had negligently and wantonly caused an accident at the intersection of 12th Street and Chestnut Street ("the intersection") in Gadsden, Alabama, in which Berry suffered injury and for which Berry sought monetary damages against Fife in the amount of $50,000. Berry amended her complaint, adding a claim for underinsured motorist coverage benefits against State Farm Fire and Casualty Company ("State Farm"). Thereafter, Fife filed a motion for summary judgment on Berry's wantonness claim, basing her motion on numerous depositions and on the application of the "sudden emergency" doctrine. At the hearing on the motion, Berry filed a "Memorandum In Response To [Fife's] Motion For Summary Judgment," in which she argued that the applicability *Page 885 
of the "sudden emergency" doctrine was a question of fact for the jury and, therefore, that Fife's motion for summary judgment was due to be denied. After the hearing, Berry filed a "Response To [Fife's] Motion For Summary Judgment," based on answers to interrogatories, numerous depositions, and her attached affidavit. The trial court entered a summary judgment for Fife. Berry filed a Rule 59(e), Ala.R.Civ.P., motion to alter, amend, or vacate the partial summary judgment for Fife on the wantonness claim or, in the alternative, to certify that judgment as final pursuant to Rule 54(b), Ala.R.Civ.P. The trial court denied Berry's motion to alter, amend, or vacate, but granted her Rule 54(b) motion to certify the judgment as final and stayed trial pending this appeal of that judgment.[1]
The accident made the basis of this case occurred on November 12, 1987; therefore, the applicable definition of "wantonness," is that found in Ala. Code 1975, § 6-11-20(b)(3): "Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others." See § 6-11-30. See, also, ShoalsFord, Inc. v. Clardy, 588 So.2d 879 (Ala. 1991). "Reckless" is defined as "careless, heedless, inattentive; indifferent to consequences," Black's Law Dictionary 1270 (6th ed. 1990); "marked by lack of proper caution: careless of consequence,"Webster's New Collegiate Dictionary 957 (1981); "having no regard for consequences; uncontrolled; wild." The AmericanHeritage Dictionary of the English Language 1088 (1969); seeHarrison v. State, 37 Ala. 154 (1861). "Conscious" is defined as "perceiving, apprehending, or noticing with a degree of controlled thought or observation: capable of or marked by thought, will, design, or perception," Webster's New CollegiateDictionary 239 (1981); "having an awareness of one's own existence, sensations, and thoughts, and of one's environment; capable of complex response to environment; deliberate." TheAmerican Heritage Dictionary of the English Language 283 (1969).
When a party alleges wanton conduct as a cause of action and seeks only compensatory damages, in an attempt to circumvent affirmative defenses available for a claim of negligent conduct (e.g., contributory negligence, the guest statute), the wanton conduct, in all cases filed after June 11, 1987, must be proved by "substantial evidence" — "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989); § 12-21-12.
However, in all cases in which the right accrued on or after June 11, 1987, when a party alleges wanton conduct as a cause of action and seeks punitive damages, the plaintiff must prove that the defendant consciously or deliberately engaged in wanton conduct ("[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others"). Alabama Code 1975, § 6-11-20(a). The word "conscious" has been defined above. The word "deliberate" is defined as "well-advised; carefully considered, not sudden or rash; circumspect; slow in determining; formed, arrived at, or determined upon as a result of careful thought and weighing of considerations; careful in considering the consequences of a step," Black's Law Dictionary 426-27 (6th ed. 1990); "characterized by or resulting from careful and thorough consideration; characterized by awareness of the consequences; slow, unhurried, and steady as though allowing time for decision on each individual action involved," Webster's NewCollegiate Dictionary 297 (1981); "careful and slow in deciding or determining; not rashly or hastily determined," The AmericanHeritage Dictionary of the English Language 349 (1969). This must be proven by "clear and convincing evidence" (§6-11-20(a)), which is defined in § 6-11-20(b)(4) as follows: *Page 886 
 "Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
Fife presented the following evidence to make a prima facie showing that no genuine issue of material fact as to the existence of wantonness existed:
At approximately 6:30 P.M. on November 12, 1989, Berry was travelling east on Chestnut Street, approaching the intersection. As Berry proceeded with a green light into the intersection, she was unable to take evasive action and became involved in an accident with Fife, in which Berry suffered injury. According to Fife's deposition testimony, she was travelling south on 12th Street, approaching the intersection, when "a rock or something flew across [her] windshield, and then [she] heard a gunshot, or something hit the windshield, a bullet or something . . . when [she] ducked [her head below the dash] and ran into [Berry]." Fife did not see Berry's vehicle before the collision. When questioned as to the circumstances surrounding the collision, Fife testified as follows:
 "Q. What was your speed, in your judgment, at the time of the collision?
"A. Forty miles an hour. I don't know.
". . . .
 "Q. Now, when you pulled up to the traffic signal, you said it was red, and then you heard the [gunshot] noise that you described?
"A. Uh-huh.
 "Q. When you went into the intersection, was the traffic light on your side, that is, facing you, was it still red?
 "A. I don't know. When I heard the [gunshot] noise, I just ducked, just kept driving.
 "Q. Had you ever come to a stop [as you approached the intersection]?
". . . .
"A. No.
 "Q. And how far were you from the intersection when you heard the [gunshot] noise that you've described and ducked and went on into the intersection?
". . . .
"A. Half a football field.
 "Q. And when you saw or heard the [gunshot] noise, then you ducked [your head down below the dash] and went on into the intersection?
"A. Yes.
 "Q. And you said you were going about 40 miles per hour?
"A. Yes.
". . . .
 "Q. Did you apply your brakes [or have time to apply the brakes or make any kind of maneuvers] before the collision?
"A. No."
According to Paula Hardwick, the passenger in Fife's vehicle at the time of the accident, Fife was slowing down and had practically stopped for the red light when they both heard a gunshot, ducked, and screamed. In answer to questions concerning the circumstances surrounding the collision, Hardwick testified as follows:
 "A. . . . I think it was about the third red light — and we heard a shot, and we were slowing down, practically stopping for the red light. And we heard a shot, and . . . we both ducked. [Fife] just ducked and pushed on the gas. I remember saying, '. . . don't run the light.' But that was it, and the next thing I know, bam.
". . . .
 "Q. Was that just a reflex action when you and [Fife] ducked down?
"A. Yes.
". . . .
 "Q. So [Fife] ducked down and mashed on the gas almost instantly . . .?
"A. Right, as soon as it happened.
". . . .
 "Q. How far away from the light were you when you heard the shot, in number of feet, if you know that, or if you can *Page 887 
judge it in, say, like an average car length? Were you two, three, one?
"A. I'd say about an average car length.
"Q. One car length [a]way?
 "A. Say, about a car length and enough space because we was not stopped but almost stopped.
". . . .
 "Q. You were about a car length and a little bit more away from the line where you should have stopped for the red light?
"A. Yes.
"Q. So [Fife] was stopping for the red light?
 "A. Right. We was practically almost stopped. I can't remember how far we was, but I know we was stopping.
". . . .
"Q. She pushed on the gas?
"A. Yes.
". . . .
 "Q. Were you concerned for your safety when all this occurred?
"A. Yes.
". . . .
 "Q. Now, as you came up to the intersection . . . what was the approximate speed that [Fife] was going before she began to slow down for the traffic signal?
 "A. I'll just guess about 35 or 40. I don't know . . . almost every red light we had to stop at, so we was going slow."
Trudy Mostella,[2] an independent witness who had no financial interest in the outcome of the litigation and who had lived near the intersection and was visiting Rosa Sims, her mother, at the time of the accident, testified that the area around the intersection is an area of "criminal activity" — "gunshots and drug dealings" — and that "people are afraid to sit out on their porch in the summertime because of young teenagers shooting in the neighborhood." Furthermore, according to Mostella, on the night in question, she "heard a gunshot, and, within a split of a second, [she] heard the accident. . . . No doubt that was a gunshot. It was not a car backfiring." According to the deposition testimony of Sims, another independent witness who had no financial interest in the outcome of the litigation and who lived near the intersection at the time of the accident, she heard gunshots immediately before the accident that were so loud that she thought they came from a shotgun.
Based on the foregoing and in accordance with our standard of review, which requires us to view the evidence most favorably to the nonmovant (Berry), we cannot hold as a matter of law that Fife made a prima facie showing that her conduct was not wanton, i.e., that she did not "recklessly" act with disregard for the rights and safety of others.
Although Berry alleged that Fife's conduct was wanton, she did not specify whether any of the damages she sought were punitive or, if so, what portion, of the requested damages were punitive. Rather, Berry's complaint read as follows: "[Berry] demands judgment against [Fife] in the sum of Fifty Thousand Dollars ($50,000.00) and costs."
To the extent that Berry seeks only compensatory damages through the wantonness claim, we hold that there was substantial evidence of wantonness under the facts of this case, because fairminded persons in the exercise of impartial judgment could reach different conclusions as to the existence of wantonness. Therefore, the trial court erred in entering the summary judgment in favor of Fife.
To the extent that Berry sought punitive damages through her claim of wantonness, she bore the burden of presenting "clear and convincing" evidence that Fife acted "with a conscious and reckless disregard of the rights and safety of others." "Clear and convincing evidence" is a standard of proof greater than "substantial evidence."
REVERSED AND REMANDED. *Page 888 
MADDOX, SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
STEAGALL, J., dissents.
[1] Because this appeal concerns only the summary judgment in favor of Fife on Berry's claim of wantonness, neither the underinsured motorist claim against State Farm Fire and Casualty Company nor Berry's negligence claim against Fife is before us.
[2] Although Trudy Mostella is married to a cousin of Paula Hardwick's husband, it is undisputed that they were not acquainted prior to the accident.