PARKER, Justice.
Lafarge North America, Inc. (“Lafarge”), and Wayne Looney (hereinafter collectively referred to as “the defendants”) appeal from a judgment entered against them following a jury verdict in favor of Lawrence Nord. We reverse the trial court’s judgment and render a judgment in favor of the defendants.

Facts and Procedural History

Nord’s claims arise out of a personal injury sustained by Nord at Lafarge’s cement packhouse (“the packhouse”). At the packhouse, various forms of bagged cement are loaded onto flatbed trucks owned and operated by companies other than La-farge, by Lafarge employees using forklifts. The drivers of the flatbed trucks drive their trucks into the loading zone of the packhouse, which consists of two loading bays. The drivers are warned by signs posted at the entrance of the loading zone to “watch for lift trucks.” After parking the flatbed truck in one of the two loading bays within the loading zone, the driver of the flatbed truck must then register with Lafarge at the packhouse’s office (“the office”) to receive his or her load assignment. A Lafarge employee then loads the flatbed truck with bagged cement using a forklift.
On June 14, 2006, Nord, an employee of Southern Tank Transport, Inc. (“Southern Tank”), drove a Southern Tank flatbed truck to the packhouse to pick up a load of bagged cement. Nord testified that he regularly picked up loads of bagged cement from the packhouse. When Nord arrived at the packhouse, a truck was parked in the first loading bay, which is nearest the office, so Nord parked his truck in the second loading bay and proceeded to walk through the loading zone to the office to register and receive his load assignment.[1] After registering at the office, Nord began walking back to his truck, and he noticed that Looney was using a forklift to load the truck parked in the first loading bay with pallets of bagged cement. Nord waited until Looney had begun to load a pallet of bagged cement onto the truck in the first loading bay before attempting to walk through the loading zone and behind the forklift to return to his truck. As Nord was walking behind the *329 forklift Looney was operating, Looney, unaware of Nord’s presence, placed the forklift in reverse in order to make a U-turn and ran over Nord’s foot; Nord testified that after Looney placed the forklift in reverse “[i]t was coming kind of fast.”
Nord suffered three broken bones in his foot, which required surgical repair. Nord incurred medical expenses for the treatment of the injury to his foot in the approximate amount of $12,985. As a result of the injury, Nord was unable to work from June 15, 2006, to November 20, 2006, amounting to $27,436 in lost wages. The parties stipulated to the fact that Nord was paid $10,440.77 for medical expenses and $14,197.48 for lost wages by Southern Tank’s workers’ compensation insurer. Nord’s physician subsequently released him to work without any restrictions.
Nord testified that he knew that he needed to be careful around “construction equipment,” such as the forklift being operated by Looney, and that if he failed to exercise caution he could be injured. During cross-examination of Nord by La-farge’s trial counsel, the following exchange occurred:
“Q. [Lafarge’s trial counsel:] We can go to your deposition, if you want. If you will pick up and turn to page 79, starting at page 19 on the deposition that’s got a number one on it. Tell me when you’re there.
“A. [Nord:] I’m here.
“Q. Question, ‘Did you have any conversation with the forklift operator before he hit you?’ ‘No’ is the answer.
“Question, ‘Do you know whether or not he knew you were in the area before he hit you?’ ‘No.’
“Question, ‘In other words, you don’t know whether he saw you at all?’ ‘No, I don’t.’
“ ‘I’m not talking about when he’s backing up. I’m talking about do you know if he even knew you were out of your truck?’ ‘No.’
“So in other words, you didn’t have any evidence that he saw you?
“A. No.
“Q. But you knew he was there?
“A. Yes.
“Q. You knew he was loading the truck in front of you?
“A. Yes.
“Q. You knew that what those forklifts do is, they drive up and they drop their pallets off on the truck, and then they’ve got to back up in order to get turned around and go get the next load, right?
“A. Yes.
“Q. And you knew that’s what he was going to do. As soon as he dropped those pallets off, he was going to back up and go get more.
“A. Yes.
“Q. And you knew that being around the forklift without him knowing you were there could be dangerous?
“A. Yes.
“Q. And at that point, you testified in your deposition that you could have just taken a left and gone along that wall and you would have never encountered him?
“A. Yes.
“Q. And what you also could have done, though, I don’t know that it’s in good practice, is — that facility is 50 yards wide. You could have walked the other direction away from the office and away from him and gone around that way (indicating)?
“A. Yes, I could have did [sic] all that.
*330 “Q. You could have done any of those things, Mr. Nord. And all I’m saying is this: The one avenue that put you in danger was to take a direct line right behind the back of that forklift. And what you did, your deposition testimony says it perfectly, you waited until he was putting the pallets down and then you walked right behind him without him ever knowing you were there, right?
“A. Yes.
“Q. When you knew that as soon as he got the pallets down, he was going to back up. You could have just stopped where you were and gone back to the computer until he was done loading that truck, couldn’t you?
“A. I could have done that, too.
“Q. I mean, we can at least agree to this: Any one of those options would have been safer than walking behind that forklift, knowing that it was going to back up?
“A. Yes.
“Q. Mr. Nord, you’ve got a right to file this lawsuit, and I promise you I don’t begrudge you for that. It’s a right we’ve all got, and it’s your right to have 12 peers deciding it. My question is this, though: If you’re honest with yourself and honest with this jury, don’t you have to admit that you bear at least some responsibility for putting yourself behind that forklift without making sure [that Looney knew you were] there?
“A. I suppose so.”
Nord further testified that he regularly walked through the loading zone in the packhouse in order to get to the office and that he had witnessed other drivers walk through the loading zone as well. Looney testified that it is not unusual for the truck drivers to walk through the loading zone. In fact, Nord and Looney testified that the drivers had to be in the loading zone in order to direct the forklift drivers where to place the pallets of bagged cement onto their flatbed trucks.
Looney testified that he was a trained forklift operator and that he had worked as a forklift operator for Lafarge since 1993. Looney testified that he had a duty to watch for pedestrians while operating the forklift in the packhouse and that it was “a basic principle of forklift operation” that the driver look in the direction he was traveling. Concerning the details surrounding the accident, Looney testified that after placing the pallet of bagged cement on the flatbed truck in the first loading bay and before backing up, he “[l]ooked left and right and looked in [his] rearview mirror.” There was some discrepancy in Looney’s testimony concerning the last time he looked behind the forklift before backing the forklift up and hitting Nord:
“Q. [Nord’s trial counsel:] Now, when you went to load that truck in loading zone one on June 14, 2006, you placed your load on the truck and then you went to back up, right?
“A. [Looney:] That’s right.
“Q. But before you backed up, you looked in your mirror, right?
“A. Looked left and right and looked in my rearview mirror.
“Q. Left, right, and then rearview mirror, right?
“A. That’s right.
“Q. And then you backed up, correct?
“A. That’s right.
“Q. And the last time you looked in your rearview mirror was before you started backing up, right?
“A. That’s right.
*331 “Q. So the last time you checked behind you was before you started backing up, right?
“A. Right.
“Q. And, in fact, once you started backing up, you didn’t look back there again, did you?
“A. I looked back once again after I cleared my forks out from under my pallets.
“Q. Now, do you recall your deposition — let me get you to the right page there. Look at page 125. The question, line 19—
“A. Okay. Hold it, I ain’t there yet, Okay.
“Q. I asked you, ‘Now, when had you last checked your mirror before you heard Mr. Nord’s hat hit the ground?’ And you answered what?
“A. ‘Before I backed up.’
“Q. ‘Before I backed up.’ That’s what you said just a minute ago to us as well, right?
“A. That’s right.
“Q. But for the first time in today or at your deposition, you just said you looked back before you — after you pulled your pallets — forks out of the pallets. That’s not what you told us before, is it?
“A. No, ma’am, it’s not.
“Q. And you were under oath before, correct?
“A. That’s right.
“Q. You had absolutely no idea from the time you put your forklift in reverse, backed away from that truck, turned way on with the back end of your truck going towards the south end of that building, you never saw Mr. Nord, did you?
“A. No, ma’am, I did not.
“Q. And that’s not because of a blind spot, it’s because you weren’t looking, isn’t it?
“A. Yes, ma’am, I was looking.
“Q. But what you’ve just talked about, you just told me that the last time you looked back was before you backed up; isn’t that correct?
“A. That’s right.
“Q. So you are now saying that the last time you looked was before you backed up but you were looking?
“A. Wasn’t nothing behind me.
“Q. Wasn’t nothing behind you. Where did Mr. Nord come from?
“A. That’s what I want to know.
“Q. So I guess he appeared out of thin air?
“A. Yes, ma’am, I guess.”
Looney testified that he did not see Nord until after he had run over Nord’s foot with the forklift.
Richard Buffkin, Lafarge’s representative at trial, testified that there were no signs or barriers in the packhouse prohibiting the truck drivers from walking through the loading zone to the office or advising them of the dangers of walking through the loading zone. Buffkin also testified that Lafarge’s forklift operators must always watch for pedestrians in the loading zone because “[t]here could be forklifts coming and going anywhere in the [packhouse].”
On May 80, 2008, Nord sued the defendants, alleging against both defendants negligence and wantonness and against Lafarge “negligent and/or wanton entrustment” and seeking compensatory and punitive damages. The defendants answered the complaint. The trial court conducted a jury trial on Nord’s claims beginning on September 14, 2009. At the close of all the evidence, the defendants orally moved for a judgment as a matter of law (“JML”) *332 as to all Nord’s claims. The defendants argued, among other things, that Nord had been contributorily negligent, that he had failed to carry his burden of proof with regard to his wantonness claim and his negligent- and/or wanton-entrustment claim, and that he had failed to prove wantonness by clear and convincing evidence. The trial court granted the defendants’ motion as to Nord’s negligent- and/or wanton-entrustment claim against Lafarge and denied the defendants’ motion as to all other claims.
Nord’s negligence and wantonness claims were thereafter submitted to the jury, which returned a general verdict on September 16, 2009, in favor of Nord and against the defendants, awarding Nord $125,000 in compensatory damages and $75,000 in punitive damages.
On October 9, 2009, the defendants filed a renewed motion for a JML pursuant to Rule 50(b), Ala. R. Civ. P., or, in the alternative, a motion to alter, amend, or vacate the trial court’s judgment pursuant to Rule 59(e), Ala. R. Civ. P. In their postjudgment motion, the defendants argued that Nord had failed to produce sufficient evidence to support the jury’s findings on Nord’s wantonness claim; that Nord’s negligence claim was barred because he had been contributorily negligent; that if the jury verdict stood the defendants were “entitled to a setoff in the amount of the damages claimed by [Nord] which [had] already been recovered by ... Nord ...”; that the trial court had erred by instructing the jury on wantonness, punitive damages, and premises liability; and that the verdict form submitted to the jury was improper. Nord filed an opposition to the defendants’ postjudgment motion. The trial court denied the defendants’ postjudgment motion on January 2, 2010, and the defendants appealed.

Standard of Review

“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11,1987, the nonmovant must present ‘substantial evidence’ in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).
“Furthermore, a jury verdict is presumed to be correct.... Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344 (Aa.1992). In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party, and it will set aside the verdict only if it is plainly and.palpably wrong. Id.”
*333 Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala.1999).
Further, “substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see also Ala.Code 1975, § 12-21-12(d).

Discussion

The defendants first argue that the trial court erred in denying their renewed motion for a JML because, they say, Nord failed to produce substantial evidence of wantonness. See Dolgencorp, Inc. v. Taylor, 28 So.3d 737, 741 (Ala.2009)(holding that, when reviewing a ruling on a motion for a JML, “‘[a] reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury1 ” (quoting Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003))). We agree.
In Ex parte Essary, 992 So.2d 5, 9 (Ala.2007), this Court defined wantonness, as follows:
‘“Wantonness’ has been defined by this Court as the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result. Bozeman v. Central Bank of the South, 646 So.2d 601 (Ala.1994). To constitute wantonness, it is not necessary that the actor know that a person is within the zone made dangerous by his conduct; it is enough that he knows that a strong possibility exists that others may rightfully come within that zone. Joseph v. Staggs, 519 So.2d 952, 954 (Ala.1988). Also, it is not essential that the actor should have entertained a specific design or intent to injure the plaintiff, only that the actor is ‘conscious’ that injury will likely or probably result from his actions. Id. ‘Conscious’ has been defined as ‘ “perceiving, apprehending, or noticing with a degree of controlled thought or observation: capable of or marked by thought, will, design, or perception” ’; ‘ “having an awareness of one’s own existence, sensations, and thoughts, and of one’s environment; capable of complex response to environment; deliberate.” ’ Berry v. Fife, 590 So.2d 884, 885 (Ala.1991) (quoting Webster’s New Collegiate Dictionary 239 (1981) and The American Heritage Dictionary of the English Language 283 (1969), respectively).”
Further, in Tolbert v. Tolbert, 903 So.2d 103 (Ala.2004), this Court held:
“ ‘What constitutes wanton misconduct depends on the facts presented in each particular case. Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala.1989); Brown v. Turner, 497 So.2d 1119 (Ala.1986); Trahan v. Cook, 288 Ala. 704, 265 So.2d 125 (1972). A majority of this Court, in Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987), emphasized that wantonness, which requires some degree of consciousness on the part of the defendant that injury is likely to result from his act or omission, is not to be confused with negligence (i.e., mere inadvertence):
“ ‘ “Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not *334 doing of some act will likely result in injury....
“ ‘ “Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act. ‘Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted.’ McNeil v. Munson S.S. Lines, 184 Ala. 420, [423], 63 So. 992 (1913)....
[[Image here]]
“ ‘ “ ‘Willful and wanton conduct has a well-defined meaning at law. It is sometimes expressed in terms of “reckless disregard of the safety of another.” Willful and wanton conduct should not be confused with negligence. It has been correctly stated that the two concepts are as “unmixable as oil and water.” ’
[[Image here]]
Willfulness or wantonness imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act, and strictly speaking, is not within the meaning of the term “negligence,” which conveys the idea of inadvertence, as distinguished from premeditation or formed intention.’ ”
“ '510 So.2d at 145-46 (citations omitted.) See also, Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala.1989).'”
Tolbert, 903 So.2d at 114-15 (quoting Ex parte Anderson, 682 So.2d 467, 470 (Ala.1996)).
Nord argues that he “proved by clear and convincing evidence that Looney consciously omitted his duty to safely operate the forklift.” Nord’s brief, at p. 26. In support of his argument, Nord alleges that the fact that Looney knew he had a duty to watch out for pedestrians while he was operating the forklift in the loading zone of the packhouse, coupled with the fact that Looney did not continually look in the direction he was traveling before running over Nord’s foot with the forklift, demonstrates that Looney wantonly operated the forklift. Nord also alleges that
“Looney made no effort to determine where Nord was before operating the forklift; he failed to look in the direction he was traveling; he failed to keep a lookout for pedestrians as evidenced by his failure to see Nord despite multiple opportunities; he failed to stop before changing direction; and he reversed the forklift at such a speed that Nord was unable to move out of the way.”
Nord’s brief, at p. 30. Nord argues that “despite [Looney’s] understanding of the care required, Looney breached his duty to safely operate the forklift by disregarding multiple safety rules.” Id. Nord also points to Looney’s testimony acknowledging that “if [Looney] operate[d] a fork-, lift without looking where [he was] going and without looking for pedestrians in [his] area, [he was] quite likely to end up hurting someone.”
The record before us does not contain substantial evidence indicating that Looney acted wantonly. The record does show that Looney knew that it was not uncommon for pedestrians to be in the loading zone of the packhouse and that he knew that failing to watch for pedestrians while he was operating the forklift could result in an injury to a pedestrian. However, lacking from the record is evidence indicating that Looney recklessly operated *335 the forklift or that he consciously disregarded his duty to watch for pedestrians while he was operating the forklift. Instead, the record indicates that Looney performed several actions looking for pedestrians in the loading zone while he was operating the forklift. In fact, Looney testified that, before backing up and running over Nord’s foot with the forklift, he “[l]ooked left and right and looked in [his] rearview mirror.” The single fact that Looney was not looking in the direction he was traveling at the time of the accident is not evidence that he acted wantonly, especially in light of the record before us.
The record, viewed in a light most favorable to Nord as the nonmovant, reveals that immediately before the accident occurred Looney was using the forklift to place a pallet of bagged cement on a flatbed truck. Upon setting the pallet of bagged cement on the flatbed truck and before backing the forklift away from the flatbed truck, Looney checked for pedestrians by “[l]ook[ing] left and right and looking] in [his] rearview mirror.” Looney then began to back away from the flatbed truck; however, Looney did not look in the direction he was traveling because he was watching the blades of the forklift to ensure that they had cleared the pallet of bagged cement he had just placed on the flatbed truck. Once the blades cleared the pallet, Looney then placed the forklift in reverse, backed up “kind of fast,” and made a U-turn in order to retrieve another pallet of bagged cement. It was in the course of making the U-turn that Looney ran over Nord’s foot with the forklift.
This does not constitute substantial evidence of wantonness, defined in § 6 — 11— 20(b)(3), Ala.Code 1975, as “[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.” Rather, the evidence indicates that Looney was aware of his duty to watch for pedestrians while he was operating the forklift, that he was conscious that pedestrians could be in the loading zone, and that he did keep watch for pedestrians, though imperfectly. Nord failed to present substantial evidence of wantonness. Therefore, we reverse the trial court’s judgment denying the defendants’ renewed motion for a JML on Nord’s wantonness claim.
The defendants next argue that Nord “has failed to prove that he is entitled to punitive damages by ‘clear and convincing evidence.’” The defendants’ brief, at p. 41. Our conclusion that the trial court’s order denying the defendants’ renewed motion for a JML was in error on the wantonness claim based on Nord’s failure to present substantial evidence of Looney’s allegedly wanton conduct pretermits discussion of this argument. Although the trial court entered a general verdict awarding compensatory damages and punitive damages, the only claims submitted to the jury were Nord’s negligence and wantonness claims. Punitive damages cannot be awarded on a negligence claim; thus, the punitive damages must have been awarded on Nord’s wantonness claim. See Jenelle Mims Marsh and Charles W. Gamble, Alabama Law of Damages § 4:4 Negligence actions (5th ed.2004) (citing Alabama Elec. Co-op., Inc. v. Partridge, 283 Ala. 251, 215 So.2d 580 (1968); Bradley v. Walker, 207 Ala. 701, 93 So. 634 (1922); Routledge v. Schmitt, 28 Ala.App. 167, 180 So. 127 (1938); and Jefferson Garage & Sales Co. v. Thompson, 21 Ala.App. 369, 108 So. 632 (1926)). Therefore, the trial court’s judgment entered on the jury’s general verdict is reversed to the extent it awards punitive damages to Nord.
Next, the defendants argue that Nord “was contributorily negligent as a matter of law and can therefore not recover compensatory damages for the [defendants’] alleged negligence.” The defendants’ *336 brief, at p. 46. This Court previously stated as to contributory negligence in John R. Cowley & Bros., Inc. v. Brown, 569 So.2d 375, 381-82 (Ala.1990):
“ ‘The law in Alabama is quite clear that while it is no defense to a claim based on wanton misconduct on the part of the defendant, contributory negligence is a complete defense to an action based on negligence. Creel v. Brown, 508 So.2d 684 (Ala.1987). In order to prove contributory negligence, the defendant must show that the party charged 1) had knowledge of the condition; 2) had an appreciation of the danger under the surrounding circumstances; and 3) failed to exercise reasonable care, by placing himself in the way of danger. Hatton v. Chem-Haulers, Inc., 393 So.2d 950 (Ala.1980); Wallace v. Doege, 484 So.2d 404 (Ala.1986).’
“Rowden v. Tomlinson, 538 So.2d 15, 18 (Ala.1988). Contributory negligence is an affirmative defense that the defendant bears the burden of proving. Rule 8(c), A[la]. R. Civ. P. ‘In order to sustain a finding of contributory negligence as a matter of law, there must be a finding that the plaintiff put himself in danger’s way, Mackintosh Co. v. Wells, 218 Ala. 260, 118 So. 276 (1928), and a finding that the plaintiff appreciated the danger confronted. [Citations omitted.] Moreover, it must be demonstrated that the plaintiffs appreciation of the danger was a conscious appreciation at the moment the incident occurred. [Citations omitted.] Mere “heedlessness” is insufficient to warrant a finding of contributory negligence as a matter of law. [Citations omitted.]' Central Alabama Elec. Co-op. v. Tapley, 546 So.2d 371, 381 (Ala.1989).”
Further, this Court has also held:
“The question of contributory negligence is normally one for a jury. However, where the facts are such that all reasonable persons must reach the same conclusion, contributory negligence may be found as a matter of law. Brown [v. Piggly-Wiggly Stores, 454 So.2d 1370 (Ala.1984)]; see also Carroll v. Deaton, Inc., 555 So.2d 140, 141 (Ala.1989).”
Aplin v. Tew, 839 So.2d 635, 638 (Ala.2002).
The defendants argue that the evidence in the record demonstrates Nord’s contributory negligence. Specifically, the defendants point to the following facts to support their argument: Nord frequently picked up pallets of bagged cement from the paekhouse and was well aware that forklifts operated in the loading zone; Nord knew that forklifts were dangerous machines that could injure a pedestrian; Nord testified that he knew that it was a safe practice to get the attention of a forklift operator when entering an area where a forklift was in operation before attempting to walk through that area; Nord indicated that he knew that once Looney placed the pallet of bagged cement onto the flatbed truck Looney would then back the forklift away from the truck; Nord also indicated that he could have taken an alternate route — one that did not require him to walk directly behind the forklift Looney was operating; and Nord testified that he was partially at fault for the injury he suffered. Nord responds by arguing that he “neither put himself in harm’s way, nor consciously appreciate^] the danger at the moment of the incident.” Nord’s brief, at p. 42. Nord puts great emphasis on the fact that forklifts could be in operation virtually anywhere in the paekhouse at anytime; thus, Nord argues, there was essentially no way to be in the paekhouse while remaining out of harm’s way.
*337 This Court has consistently held that a defendant raising the affirmative defense of contributory negligence as a matter of law satisfies his burden of proof when he presents evidence indicating that the plaintiff, appreciating the danger of his actions, voluntarily enters into a dangerous situation thereby proximately contributing to his injury. See Aplin, 839 So.2d at 638-39; Campbell v. Alabama Power Co., 567 So.2d 1222, 1225 (Ala.1990); Watters v. Bucyrus-Erie Co., 537 So.2d 24, 25 (Ala.1989); and Allen v. Knotts, 530 So.2d 812, 816-17 (Ala.1988). In the case at hand, the record indicates that Nord appreciated the danger posed by walking behind a forklift without the operator’s being aware of his presence. Nord indicated that he knew that Looney, upon placing the pallet of bagged cement on the flatbed truck, would place the forklift in reverse and back it away from the flatbed truck and move in his direction. Yet Nord, aware of the risk involved, voluntarily placed himself in harm’s way by walking behind the forklift Looney was operating, resulting in Nord’s injuries. The facts of the present case concerning Nord’s contributory negligence are such that all reasonable persons must reach the same conclusion — that Nord had knowledge of the conditions, that he had an appreciation of the danger presented, and that he failed to exercise reasonable care by placing himself in harm’s way, thereby proximately causing his injuries.[2] See Wallace v. Doege, 484 So.2d 404 (Ala.1986) (reversing a judgment entered on a jury verdict in favor of the plaintiff on the basis of the plaintiffs contributory negligence and rendering a judgment in favor of the defendant). Therefore, we reverse the trial court’s judgment on the negligence claim.
The defendants present numerous other arguments on appeal. However, our conclusion that the trial court’s judgment be reversed pretermits discussion of those arguments.

Conclusion

Based on the foregoing, we reverse the trial court’s judgment and render a judgment in favor of the defendants.
REVERSED AND JUDGMENT RENDERED.
STUART, BOLIN, MURDOCK, SHAW, and WISE, JJ., concur.
MALONE, C.J., and WOODALL and MAIN, JJ., concur in the result in part and dissent in part.

. The first loading bay was located between the office and the second loading bay, where Nord had parked his truck.

. Nord argues that because forklifts could have been operating virtually anywhere in the packhouse there was essentially no safe place in the packhouse and by virtue of being in the packhouse he necessarily put himself in harm's way. However, we do not base our decision that Nord was contributorily negligent on the mere fact that he was in the packhouse but on the evidence and the specific events leading up to the accident, as set forth above.